**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Joseph A. Schiavone Corporation | : | Civil Action |
| Michael Schiavone, | : | No. 302 CV-1718 (RNC) |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| Philip Kasden, | : | |
| Northeast Utilities Service Company, and | : | |
| Connecticut Light and Power Company, | : | |
| | : | |
| Defendants | : | December 13, 2004 |

**Plaintiffs' Memorandum Of Law**
**In Support Of Their**
**Motion For Partial Summary Judgment As To Liability**

This *Memorandum* is filed in support of *Plaintiffs' Motion for Partial Summary Judgment* seeking summary judgment as to the liability of the defendants under CERCLA. In accordance with FRCP Local Rule 56(a)1, plaintiffs' Local Rule 56(a)1 Statement is annexed to their *Motion for Partial Summary Judgment*. The plaintiffs seek summary judgment as to the defendants' liability in this matter pursuant to CERCLA. As set forth in more detail below, plaintiffs have established the elements of a prima facie case for CERCLA liability. No genuine issues of fact exist with respect to the defendants CERCLA liability in this matter.

**Introduction:**

The following background is offered by way of introduction. All facts relevant to the *Plaintiffs' Motion for Partial Summary Judgement* will be reiterated, with citations to evidence, in the discussion section of this Memorandum. This case involves the contamination and clean up of Lot 2 and a portion of Lot 2A located at 250 Universal Drive North, North Haven, Connecticut (formerly known as 175 Universal Drive). Lot 2 and Lot 2A are adjacent and bordered on the west by the tidal marsh area of the Quinnipiac River known as the Quinnipiac River Meadow Marsh, with Lot 2A located north of Lot 2. *See* attached Figure 1.

History of property ownership, use, and prior remediation.

In November 1966 the trustees of the New York, New Haven & Hartford Railroad sold Lot 2 to Lloyd Terminal, Incorporated, a corporation owned by the shareholders of H. Kasden & Sons, Inc. On March 22, 1968 Lloyd Terminal, Incorporated transferred Lot 2 to H. Kasden & Sons, Inc.

Thereafter H. Kasden & Sons, Inc. operated a scrap yard on Lot 2 from the late 1960s until 1981 and, evidently from aerial photographs, encroached in part on what is now known as Lot 2A. Until the practice was banned by the US EPA in April 1978, in the scrap trade copper was recovered from transformers by the purchase of scrap transformers by scrap operators based on the amount of copper in the core of the transformer and the spot price of copper. The transformer would be picked-up, transported to the scrap yard, cut open and drained of oils and PCBs, or in some cases an effort would be made to burn off the oil. Such burning might have had some success for removing the oils

from the transformers, but would have been ineffective in removing or destroying the PCBs. PCBs were added to transformer oils as a flame retardant. Current EPA approved practices for the destruction of PCBs requires incineration with a residence time of two seconds at 1200 degrees Centigrade (2192 degrees Fahrenheit) at three percent excess oxygen, or 1.5 seconds at 1600 degrees Centigrade at two percent excess oxygen.

Michael Schiavone & Sons, Inc. acquired the stock of H. Kasden & Sons, Inc. on March 20, 1981. Michael Schiavone & Sons, Inc. wound down scrap operations on Lot 2, since the Michael Schiavone & Sons, Inc. yard is located approximately 1.75 miles, by road, from Lot 2 and had better access to Interstate 91. Before the construction of Universal Drive North, the construction of Universal Drive north from Exit 9 of Interstate-91 in 1984, the travel distance would have been indirect (about 10 minutes) and much greater between the Michael Schiavone & Sons, Inc. yard at 234 Universal Drive and the H. Kasden & Sons, Inc. yard at Lot 2.

On December 31, 1984, H. Kasden & Sons, Inc., a wholly-owned subsidiary of Michael Schiavone & Sons, Inc., sold Lot 2 to Michael Schiavone. Earlier in 1984, on October 23, 1984, Michael Schiavone had acquired Lot 2A from Exit Nine Limited Partnership. Exit Nine Limited Partnership was in the process of redeveloping a large tract of land it had acquired from the trustees of the Penn Central Railroad (Penn Central had acquired New York, New Haven & Hartford Railroad before the Penn Central bankruptcy reorganization). In advance of the sale to Michael Schiavone in 1984, the Connecticut DEP had approved a remedy that had been installed on Lot 2A

3

by Exit Nine Limited Partnership. The 1984 remedy on Lot 2A was designed to remedy the creosote lagoon that had been operated on Lot 2A by the Moss American Creosoting Company from 1921 to about 1968.

Sometime in the early 1990s the DEP approved remedy on Lot 2A failed. Creosote from the creosote lagoon seeped into the Quinnipiac River Meadow Marsh. Connecticut DEP issued orders to Michael Schiavone; the successor to the Moss American Creosote Company, Kerr-McGee, Inc.; and the successor to the Penn Central Railroad, American Premier Underwriters, Inc. Michael Schiavone instituted suit alleging violations of CERCLA and CGS §22a-452 by the developers who sold Lot 2A to him, American Premier Underwriters, and Kerr-McGee. That case is styled as *Schiavone v. Pearce, et al.,* docket number 3:91 CV-00662 (CFD), and it settled on March 7, 2000, pursuant to the terms of a confidential settlement agreement among Michael Schiavone as plaintiff and the defendants consisting of Herbert H. Pearce, Donald P. Lippincott, Kerr-McGee Chemical, LLC and American Premier Underwriters, Inc. Pursuant to the settlement the performing parties retained KU Resources, Inc. to design and construct a new remedy on Lot 2A. The new remedy was eventually approved by the Connecticut DEP and installed on Lot 2A. The creosote claims did not involve CL&P/NUSCO, just as the PCB claims do not involve the creosote parties.

Discovery of contamination relevant to this matter.

In May 2002 during an inspection of the remedy at Lot 2A on the southern border of Lot 2A, in the vicinity of the western end of the border between Lot 2A and Lot 2, the project manager for

the Connecticut DEP found some oil in the drainage swale. The project manager took samples and had the samples tested. These samples resulted in the discovery of PCBs on Lot 2A. DEP demanded investigation. PCBs were subsequently discovered on Lot 2. The *site*, the contaminated portions of Lot 2 and Lot 2A relevant to this matter, will be referred to as Lot 2/2A.

Michael Schiavone and the Joseph A. Schiavone Corporation retained KU Resources, Inc. to undertake an investigation of the Lot 2/2A PCB release. In the course of the investigation of the PCB release, KU Resources took 2,216 +/- soil samples, numerous groundwater samples, and sediment samples in the Quinnipiac River Meadow Marsh.

Since the PCB discovery, KU Resources has worked closely with the CT DEP and the US EPA. The DEP issued Order # SRD-161 to Michael Schiavone with respect to the PCB site on or about June 3, 2004. The plaintiffs have engaged in productive negotiations with the DEP[1] with respect to the remedy for Lot 2/2A. Recently, an agreement has been reached with respect to remediation design and a schedule for implementation is being negotiated.

Plaintiffs' claims are based on CERCLA § 113 (Count I), CGS § 22a-452 (Count II), and CGS § 22a-16 (Count III). Claims for declaratory relief are made pursuant to CERCLA and the Declaratory Judgments Act, 28 USC §§ 2201-2202 (Count IV). *Plaintiffs' Motion for Partial Summary Judgment* seeks summary judgment as to the liability of the defendants under CERCLA.

---

[1] Although DEP is currently taking the lead, EPA has remained actively involved in the process as well.

**Discussion:**

**Summary Judgment.**

The standard of law with respect to summary judgment was well summarized in *Brown v. County of Oneida*, 2000 WL 1499343, *2-3 (N.D. N.Y. 2000):

> If ever a standard of law was well-settled, it is the standard for summary judgment. Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam* ). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." FRCP 56(e).
>
> To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Id.,* at 250-251, 106 S.Ct. at 2511.

**CERCLA Liability.**

There are no genuine issues of fact to be tried with respect to the issue of the defendants' liability under CERCLA in this matter. Plaintiffs can establish a *prima facie* case as required under CERCLA and the controlling precedent in this Circuit, *BF Goodrich et al. v. Betkoski et al.,* 99 F.3d.

505 (2d Cir. 1996), rehearing denied 112 F. 3d. 88 (2d Cir. 1997), cert denied sub nom *Zollo Drum Co., Inc. v. B.F. Goodrich Co.*, 141 L. Ed. 2d 694, 118 S. Ct. 2318 (1998), which sets the elements for a *prima facie* case as:

> ... (1) the defendant is within one of the four categories of responsible parties enumerated in 42 USC §9607(a)²; (2) the landfill site is a facility as defined in 42 USC §9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan. 42 U.S.C. § 9607(a); *Alcan [U.S. v. Alcan Aluminum Corporation,* 990 F.2d 711 (1992)] , 990 F.2d at 719-20; *Murtha I [B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2d Cir. 1992)], 958 F.2d at 1198. ...
>
> If the plaintiff can establish each of the *prima facie* elements on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence that an affirmative defense applies, summary judgment on liability is appropriate. *Alcan*, 990 F.2d at 720. Significantly, it is "*not* required that the [plaintiff] show that a specific defendant's waste caused incurrence of cleanup costs." *Id.* at 721. Because CERCLA imposes strict liability, there is no causation requirement.

*Betkoski*, at 514-515 (footnote 2 added).

---

² 42 USC § 9607(a)(1)-(4) provides in relevant part:

(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for ...

1.      <u>Defendants are within one of the four categories of responsible parties</u>.

Potentially responsible parties under CERCLA must first meet the broad definition of "person" set forth at 42 USC § 9601(21). NUSCO and CL&P are each Connecticut corporations. LRS, ¶¶ 6 and 7.[3] Pursuant to 42 USC § 9601(21), corporations are persons.

The third category of potentially responsible parties includes: "... any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... ". 42 USC § 9607(a)(3). NUSCO and CL&P owned or possessed transformers containing the hazardous substance, PCBs, had control over the disposal of those transformers, and arranged for the disposal or treatment of the transformers, and the PCB oil contained therein, at the Lot 2/2A site. The defendants meet the requirements of the third category. LRS, ¶¶ 10 - 15, 26, 27, 28, 39, 40, 41; *see also* 40 CFR §761.2(a)(3).

For a period of time beginning no later than 1971 and continuing through at least 1978, defendants arranged for the disposal of PCB containing transformers at the Lot 2/2A facility. LRS, ¶¶ 11, 26, 27, 39, 40, and 41. The CL&P/NUSCO documents show that there was a relationship that existed for a number of years by which scrap transformers were purchased by H. Kasden & Sons

---

[3] *Plaintiffs' Local Rule 56(a)1 Statement* ("LRS") is appended to *Plaintiffs' Motion For Partial Summary Judgment As To Liability*. Reference in this Memorandum is made to the relevant numbered paragraphs of the LRS. Affidavits and other documentation supporting statements of fact are cited in and attached as exhibits to the LRS.

from CL&P/NUSCO from at least as early as 1971 and as late as November 1977, when 33 "scrap transformers" were picked up by H. Kasden & Sons from a CL&P facility. LRS, ¶¶ 11 and 26(e).

The CL&P/NUSCO transformers contained PCBs. "PCBs were used for thirty or forty years by the electric utility industry as a dielectric fluid in transformers." *Central Maine Power Co. v. F.J. O'Connor Co.*, 838 F. Supp. 641, 643 (1993). EPA regulations provide a rebuttable presumption that *any transformer* manufactured before June 1979 contains PCBs. 40 CFR §761.2(a)(3); LRS, ¶ 28. The regulation provides specific ways in which the presumption can be rebutted, allowing rebuttal by either (1) a label on the equipment or manufacturer documentation or (2) service records. NUSCO and CL&P have not done so. The defendants have provided no evidence, in response to specific discovery requests tracking the requirements of regulation, to contest the presence of PCBs in their transformers. In fact, just the opposite, NUSCO admits is has none. LRS, ¶¶ 11-15.

The evidence demonstrates arrangement for disposal of numerous transformers over a significant period of time. However, the *number* of transformers the defendants arranged for the disposal of is not relevant to the issue of liability. While the amount of hazardous substance attributable to a responsible party may be a factor in the *allocation* phase of CERCLA litigation, it is not a factor in establishing *liability*.

> Twice we have said that **quantity "is not a factor" when determining CERCLA liability** because had Congress wanted to distinguish liability on the basis of quantity, it would have so provided. *Murtha I,* 958 F.2d at 1200; *see also Alcan* at 720 ("The statute on its face applies to 'any' hazardous substance, and it does not impose quantitative requirements."). The absence of threshold quantity requirements in

9

>   CERCLA leads logically to the conclusion that the Act's "hazardous substance" definition includes even minimal amounts. *See Alcan,* 990 F.2d at 720.

*Betkoski*, at 517 (emphasis added). Therefore, for purposes of summary judgment on CERCLA liability, this Court need not consider or determine the quantity of hazardous substances attributable to the defendants. It is sufficient that there be no genuine issue concerning the fact that the defendants disposed of, or arranged for the disposal of, even a single PCB containing transformer.

2.  <u>The Lot 2/2A site is a facility</u>.

>   A CERCLA facility is:
>
>   (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) **any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located**; but does not include any consumer product in consumer use or any vessel.

42 USC § 9601(9) (emphasis added).

There is no question that hazardous wastes have *come to be located* on Lot 2/2A. LRS, ¶¶ 9 and 16. PCBs are a listed hazardous substance pursuant to 42 USC § 9601(14)(B) since they are a compound, mixture, solution, or substance designated pursuant to 42 USC § 9602 and listed in Table 302.4 of 40 CFR § 302. LRS, ¶ 10. PCBs have been found at various locations on the Lot 2/2A site. LRS, ¶¶ 9 and 16. Lot 2/2A is a CERCLA facility. LRS, ¶ 17.

3.     <u>A release of hazardous substances has occurred at the Lot 2/2A facility.</u>

CERCLA requires that there be a release or threatened release of a hazardous substance at the facility. 42 USC 9607(a); *Betkoski*, at 514-515. A release is defined as:

> ... any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C.A. § 2011 et seq.], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C.A. § 2210], or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title, and (D) the normal application of fertilizer.

There has been a release of hazardous substances at the Lot 2/2A facility. LRS, ¶ 18.

4.     <u>Plaintiffs' have incurred response costs.</u>

The plaintiffs have incurred response costs with respect to the release of a hazardous substance, PCBs, at the Lot 2/2A facility. As of September 30, 2004, Harbor Circle, LLC[4], itself and as successor to Joseph A. Schiavone Corporation, had incurred costs totaling $1,231,513 for

---

[4] Harbor Circle, LLC is the successor to the plaintiff Joseph A. Schiavone Corporation which has been dissolved. LRS, ¶¶ 21 and 22. Plaintiffs intend to file a motion for substitution of Harbor Circle, LLC as a plaintiff.

investigation and remediation of PCB contamination the Lot 2/2A facility. LRS, ¶¶ 19 and 25. Since May of 2002, Michael Schiavone has incurred at least $10,000 in costs for investigation and remediation of PCB contamination at Lot 2 and 2A. LRS, ¶ 20.

5.  Plaintiffs' response costs and actions are consistent with the National Contingency Plan.

Since discovery of the PCB contamination in May of 2002, KU Resources, Inc., as consultant to and environmental engineers for the plaintiffs, has worked with the Connecticut DEP and the U.S. EPA on investigation, installation of an interim remedy, and development of a design for the remediation of the Lot 2/2A facility. LRS, ¶ 42. Based on the RI/FS submitted to the agencies in May 2004 and the Conceptual Design submitted in October 2004 (as modified in November 2004 and December 2004), it is the intention of DEP and Michael Schiavone to enter into a Consent Order with respect to remediation of the Lot 2/2A facility. LRS, ¶¶ 42 and 43.

The response actions taken and response costs incurred to date for investigation and remediation of PCB contamination at the Lot 2/2A facility are consistent with the National Contingency Plan. LRS, ¶¶ 23 and 24.

**Conclusion:**

Plaintiffs have demonstrated there is no genuine issue of fact with respect to each element

of a *prima facie* case for CERCLA liability. Plaintiffs respectfully request that partial summary judgment, as to the defendants' CERCLA liability, be entered.

> Respectfully submitted,
> Joseph A. Schiavone Corporation, and
> Michael Schiavone
> Plaintiffs
>
> /s/ Nicholas J. Harding
> Nicholas J. Harding
> Federal Bar No. ct06387
> Kosloff & Harding
> Their Attorneys
> 28 North Main Street
> West Hartford, CT 06107
> Tel: (860)521-7004
> Fax: (860) 521-3352

F:\WPDOCS\Schiavone\PCB 2057.11\Fed Pleadings\Summary Judg Mot\SummJudgeMemo.wpd

## Certificate of Service

I hereby certify that a copy of the above was mailed or delivered in hand on December 13, 2004 to all counsel and pro se parties of record as follows:

Connecticut Light and Power Company

    Charles J. Nicol, Esq.
    Angela L. Ruggiero, Esq.
    Northeast Utilities Service Company
    P.O. Box 270
    Hartford, CT 06141-0270

    Tel:   665-3431 / 665-3495
    Fax:  665-5504

Northeast Utilities Service Company

    Charles J. Nicol, Esq.
    Angela L. Ruggiero, Esq.
    Duncan Ross MacKay, Esq.
    Northeast Utilities Service Company
    P.O. Box 270
    Hartford, CT 06141-0270

    Tel:   665-3431 / 665-3495
    Fax:  665-5504

_____
Nicholas J. Harding

Filing Location:

Office of the Clerk
U.S. District Court
450 Main Street
Hartford, CT 06103



FIGURE 1